www.Cot'N Wash Inc. v. Sun Products Corporation Do you understand my concern? My concern is that the applicant was making it clear on the record how it understood the relationship between the claim and Example 1 and was saying that when talking about the liquid concentrate having less than 2% water in the claim, it was referencing Example 1, which is telling everyone that it's the liquid concentrate as formulated, not after it exists for perhaps some period of time after it's packaged. Why is that a misreading of the prosecution history? Because I believe that at 2%, that example still... To enable the claim, the specification only has to allow the person skilled in the arts to practice without undue experimentation. And that, at the 2%, when you look at the language... Excuse me. The language itself... The cleaning package containing, according to Claim 1, wherein said cleaning concentrate comprises no more than 2% water weight. So, I mean, if there is an issue concerning water in the ingredients, the claim itself measures water in the finished product. So, again, at most, that might be an issue concerning enablement of Claim 2. I guess, why are we talking about enablement when I'm trying to focus on what did the applicant understand his claim to mean when he referenced Example 1's example of, as formulated, 2% water? Well, I think throughout the patent and the examples, the language makes clear, and if you look at the prior history, what they were teaching away from was that it would be below 10% water weight. There was no question about the formulation. There's no real indication that formulation really entered into the inventor's mind in that sense. The whole focus is on, as contained in the packet, is it less than the 10%? What if I read all the examples in the spec as talking about compositions as formulated? And what if I think about that one paragraph about less than 10%, less than 7.5%, less than 5% as about creating a liquid concentrate as formulated to have less than those particular recited percentages of water? Then it does seem like that the patent specification, at least, is really talking about the as formulated version of whatever liquid concentrate that you are about to put into a packet. Well, this course repeatedly warns against confining claims to examples in the specification, and when you read the dependent claims, they use the term about in there, which indicates, too, that I think both sides experts agree that the water content does not change much in the process. So, listing the ingredients is a reasonable way to describe how to practice the patent in the examples, and both agree there could be some variance in the water content. So, the dependent claims use that about term in recognition of that. I see I have a minute left. Does any expert say that... Don't worry, we'll give you a couple of minutes. Thank you. As I say to people, you don't have a right to sit down. Okay, thank you. Did any expert say anything like there's just no way that the water content will ever go down by more than 20% or more than 30%? I seem to recall everyone saying they recognize there's going to be some variance. It depends on handling and storage conditions, but we never really know how much of a variance there is going to be. Judge Chen, I don't recall there being anything that's that extreme in the record. Everyone agrees that there might be some variation, but they also agree that it's generally pretty stable and that it's not going to change to an extraordinary degree. So, again, this is something that they can anticipate in their manufacturing process. The 7.5% is a bright line, and unlike the Halvern case, which they rely on and claim that there's an indefiniteness issue here, this is not a situation where a single product may or may not infringe in certain circumstances. The differences here, when you tested the off-the-shelf product, was like 0.2% difference, which is a pretty small difference. So, what you're saying is that a fairly small difference can make the difference between infringement and non-infringement, right? Of course. Of course, it can. But it can also be anticipated. And the manufacturer can factor that in and account for it in the context of their manufacturer of the product. So, the 7.5% is a bright line, and it's a test that can be performed through Carl Fisher testing. Any person who is ordinarily skilled in the art would know that that is a testing method that can be used. You've chosen to sue the manufacturer. That's Sun Products, right? I'm sorry? You've chosen to sue the manufacturer of Sun Products. Well, as manufacturers, it doesn't seem that there's evidence that it's got less than 7.5% water. So, you're saying they ought to be able to predict that over time and under certain environmental and storage conditions, that that water content might actually fall under 7.5%. Is that your argument? Within a certain degree of certainty. Let's look at your expert. Your expert testimony is at A5060. For the appendix. A5060 in your appendix. Mr. Kong. Who's your expert? Is that right? Dr. Stephen Kong? Yes. So, as manufacturers, these things don't infringe. But you're saying possibly when used, possibly when sold, they infringe. But Sun Products is not the one using them. So, it seems like if you want to go after someone for infringement, it's got to be the customer in that case. But anyway, let's see what they should have known or not known according to your expert on A5060. Now, at the top it says confidential. So, please tell me what I'm allowed to say and not say. I don't see anything in here that ought to be confidential, but I don't want to breach anybody's confidentiality. I don't think there's an issue with that. We're specifically on those. So, why don't you look at 43. Page 43, line 20, where it's talking about the time the invention made. Now, before that, on 42, it's talking about environmental conditions and storage. You can see that right up at the top. We don't have the preceding page, which I'm sure goes into more detail on it. But at about 43, they start asking questions about will the liquid content go up or down with storage? And the answer is, I believe, yes. Back then, the film manufacturers, but that's something that needs to be looked at. But I would say it was known back then. So, then the next question is, so, would the water content go up or down? Answer, that there are, yes. There's a possibility of being some change. That's certainly possible. And sometimes it can go up, right, depending on conditions. Answer, right. I don't think you can necessarily predict that. But, yeah, if it can change, I could see it go up or potentially it could go down. Sure. It seems to me that your own expert has left quite a bit of unpredictability, is his expressed testimony, in whether water content would go up or down depending on a variety of undefined circumstances. So, how is it that this manufacturer, Sun Products, is supposed to understand at the time that they manufacture this that when it's used, and your own expert says, I can't predict for sure. Could go up, could go down, don't know. How have you made a case, in this instance, for the idea that that manufacturer ought to know over time it's going to go one particular direction? Well, I mean, he goes on to say, if you want, I think there is, it's less than precise, the answer, because he does go on to say, I read the declarations, it didn't sound like there was anything out of the ordinary with regards to the environmental conditions, let's say that these packets were at, so I had no reason to question that there was going to be any issues. And there's far from any precision around the environmental conditions that are being referred to, and he does say, right, I don't think you can necessarily They're making and selling something that does not infringe at the time they are, and you're saying at some point later, after it's sat on the shelf and exposed to heat and a lot of humidity, whatever, it's going to change. And what your expert says is, but that change could cause it to go up or down, we don't know and can't predict. Well, I think It feels a little tough for me to conclude that You made a case for suing them. You want to go sue the user? Go to their house, put an injection in, figure out how much water content is in there, and then sue the individual user. All right. I think that that particular passage doesn't get us to the point of concluding that you cannot predict within a certain reasonable range what this product will look like in a short period of time in terms of the water content contained within the packet. Yeah, but what's the range? The range may make the difference between infringement at the time of the original packaging and sale and non-infringement then and infringement later. That's the problem. Well, again, to get to this point, though, I mean, the court had to go beyond the clear language of the claim, and the clear language of the claim is what it is. It's never addressed in the district court's order. The district court's order does say there's relevant testing in footnote 13, which is at the time of the original packaging, and that testing uniformly shows non-infringement. Under their formulation of the claim? No. Under formulation which says that the relevant test at the time was packaged by the manufacturer, and that testing shows no infringement. So even if you're right that you have to find out what's in the package, it would seem as though the correct interpretation would be at the time that the manufacturer placed it in the package or perhaps at the time the manufacturer sold it, but there's no evidence of infringement at the time of manufacture or at the time of the sale by the manufacturer. That's the same point that Judge Moore was talking about That's their problem. Do we know how long afterwards the testing was? There actually is a declaration that the district court docket 169, Exhibit 17, and it's a declaration of Mr. Propper, and he says the products were sent for testing to the lab within a few days of purchase. Yeah, but how long was it between the... The purchase and the shipping. Yeah. Yeah, the record item. Okay. All right. If you were... Yeah, just a last question. If you were to write a letter to some products and tell them here's the number, the water percentage number you need to be at or above to make sure you don't have to worry about infringing this patent, what would that water percentage number be? It would be 7.5% at the time of manufacture sale or use, and it would be up to... Right, but let's try to be a little reasonable. I mean, what if they... They need to make a product. Would you say if you make a product at 8% water or above, that's going to never... That will never infringe this patent? Yeah, 7.5. Or 8.4? Do you understand the... I understand what you're saying, Mr. Cheney, but, I mean, that's up for them. It's up to them to decide, and there may be different things that they do in their process and different ways that they do it that may or may not affect, you know, what that water content may be at the time of sale or use. Do they have to predict the unpredictable? Well, no, that's up to them. What's clear is what the claim says. But if your expert says it's really kind of unpredictable... Well, I think that that's a somewhat generous or, I would say, strange interpretation of what it is that the expert is saying. I think there's some variability. The point is, it's up to them to decide that. The claim is clear, and when we're talking about claim construction, we're not talking about infringement. Remember, this is an issue of claim construction and not a question of infringement, and I think that there is some confusion here, and what Sun tries to, you know, urge is basically... Well, this is a summary judgment of non-infringement, is it not? I'm sorry, Judge? Isn't this a summary judgment of non-infringement? There is a summary judgment of non-infringement. And can't we uphold a summary judgment of non-infringement on any basis upon which the record would support? Well, yes, but here, the point is that... I guess Judge Steig's earlier point was, even under your claim construction, this record doesn't support summary judgment, doesn't support overturning. No, under our claim construction, their product infringes. Okay, we'll give you two minutes. Mr. Taylor. May I speak in court? Harold Taylor for Sun Products. I do want to start out by addressing the question that you asked, Judge Steig, about the length of time that these products were in existence before they were tested. If you have the chance to refer to the record beginning at about page 8, 1331, and then some selected pages begin there from our Galbraith paper. You'll see that some of the products were tested quite a bit after the time that they were manufactured, up to over a year and a half after manufacture. Where is that? Record pages 8, 3, 3, 1. 3, 3, 1? 3, 3, 1 through 8, 3, 4, 6. You'll also see there that the... What about 8? Why don't you turn to 8, 41, 80? I do want to hear more about what you're saying. Excuse me, 8, 1, 3, 3, 1. I'm sorry. That's okay. 1, 3, 3, 1 to 1, 3, 4, 6. Okay. I definitely want to hear more about that, but why don't you turn to 8, 41, 80? 8, 41, 80. Again, it says confidential at the top, so if I start going down a road that causes anybody to pause, yell at me, otherwise I'm going to assume I can because I don't see anything that probably ought to be confidential in here, but if I start treading on somebody's rights, please speak up. So take a minute, look at 41, 80, make sure there isn't anything that's causing you concern before I start speaking. Okay. So these are their test results, right? These are their test results at 41, 80 showing their testing in the lab of a number of sewer products. Am I reading this right? That's correct. Okay. And lots of the test results came back under 7.5% water content, at least according to these results. That's correct. We do have some serious issues with the results, their accuracy, their reliability. But this is summary judgment, so your issues with the results can't be a basis, really, for me to affirm a summary judgment grant, right? So why is it that these results ought not to result in a reversal in their favor? Well, they tested the wrong thing, Your Honor. They tested the wrong thing. For one, according to the claim construction, and what we believe is the correct claim construction, the patent, the claim, the specification, and file history, as you were discussing earlier, all talk about the water content of the liquid cleaning concentrate as formulated. Okay. Just suppose, hypothetically, that I actually thought that the claim construction that ought to apply is the packet after manufacture, okay? So for you, as a manufacturer, suppose that I was of the view that the proper claim construction would be a measure of the water content after you put the thing together with the film and you measured it inside that packet. You stuck a little needle in and you figured out, I know it would destroy the packet, but you'd figure out what the water content was. If that's the case, if that's the way I think the claim ought to be construed, what do these test results tell me about whether or not they've established a case for a potential fact question and a minimal infringement? They also tell you nothing about whether certain products made, used, or sold an infringing product. And here's why. These products were tested, in some instances, long after they left certain products controlled. And if you look at these test results, on one day, the same product is tested. It has a water content that is clearly not infringing. You can look at the first example in the table here. I assume that these are one, two, three, four, five. Five little packets, right? They all have the same manufacturer name, which I won't say out loud, but I'm assuming that this is basically they took each of five little packets and tested them? Is that right? In some instances, Your Honor, but the point here is that some of them were below and some of them were above. Exactly. With product that was long after it's left the control of certain products. And if you go back to the record, with the real testing of these products before they left the control of certain products. That's in footnote 13. Exactly. What you referred to in footnote 13, the samples that cotton watch, by and large, chose not to rely on intent. None of those. None of those. You all falling under the seven and a half percent. None. So would this be a fair statement? Would it be fair to say they could sue the third party distributors, possibly? If, for example, it was shown that a large, large percentage of these things were under seven and a half percent, well after they left sun's control, and if the record shows it's somewhat unpredictable how they go up or down. Because, I mean, obviously you're going to store them in heat or not in heat, in humidity, not in humidity. This is water content in a little film. I mean, even my kids would probably know that that might change with environmental conditions beyond your control to anticipate. But wouldn't it be fair, for example, suppose that a user, suppose that I had a box of these in my house, and they sued me for infringing use of a packet which contained the water content under seven and a half percent. And they were able to test it, and every one of the ones I had in my house was at four percent, and otherwise fell within their claims. Couldn't they actually sue me for infringing use under these claims? Well, I think they may be able to sue you, but I think under that hypothetical, those claims are clearly invalid. Because they're indefinite. How could a person be apprised, as to the scope of that claim, whether they are operating inside or outside of it, when today, if it's kept in a dry environment or a normal environment, or the package is not open, you're outside of the claim, and they move their same pack to a very humid environment and leave it open for months and months and months, and the water content increases, that very same product could then be within, according to Codd and Washington's view, within their claims. So how could that be? There's another alternative, which would be to read the claims as saying that the test is what's the water content immediately after it's packaged at the manufacturing plant. And so the fact that it changes later then wouldn't render it infringing, because it would only be infringing if at the time of original packaging it had the wrong water content. That is certainly an alternative, but we believe that if you look at the record, not only the claims, the specification, the file history, and everything and every witness that testified understood these claims to mean measuring the water content as formulated. Suppose this was the case. Suppose you manufacture it. You've got these little packets. You do. I know this is not your pattern, but suppose you have these little packets, and you sit them in the warehouse, and you do nothing with them for five years. And your engineer comes to you and says, well, we can sell these, but just so you know, there's no doubt in my mind that the water content now is under 7.5% because they've been sitting in the on-air condition, hot sun factory for the last five years. We can still sell them, but they're definitely going to be under 7.5% when we sell them. They're going to be like 4% at best. That's my new hypothetical fact pattern for you. Now, you sell those things. Are you infringing? I believe you're not. Why? Because, again, we have a situation here where that same packet under that claim construction two months down the road could be back at its original water content, 8.5%, 9%. Okay? When you look at the file history, when you look at the claims, everything says that you measure the water content as formulated. This pattern is all about avoiding interactions between the liquid cleaning concentrate and the packet, the water-soluble packet. You only do that if you formulate that water content or concentrate in a manner to avoid that interaction. And if you look at file three of the pattern, beginning at lines about 37, it says you want to avoid those interactions at packeting, the time the materials are put together, storage, and in use. So you only do that in all of those scenarios if you start with a composition that is below that claim water content. Now, you have to consider also what happened during the prosecution of this fact. This pattern is all about, if you look at the specification, it's all about distinguishing one key reference, the Kennedy reference. The Kennedy pattern, 446 pattern. And if you look at how they distinguished Kennedy, they said, we're lower than Kennedy. Initially, it started out at below 10%. Kennedy's bottom water content is 10%. The patent office said, no, Kennedy contemplates at least as low as 10%. You need to go lower. They lowered their claims to 7.5% water content or lower to distinguish from Kennedy. Now, every witness, their expert and our expert, agreed that Kennedy described as formulated water content. So, you cannot make a distinction between Kennedy based on water content unless the patent here, the 319 patent, is directed to as formulated water content. It otherwise makes no sense. And it otherwise would not have been a distinction from Kennedy. Now, you heard discussion about the claims that the court below blew by the claims. Well, the claims themselves refer to as formulated materials. If you look at all of the dependent claims, claims 9-14, for example, they specifically include the compositions, the as formulated compositions, from the examples. Each of the examples are specifically recited. The ingredients of those examples are specifically recited in those dependent claims. So, question that those claims which depend on the claim 1, which is that issue in this case, are as formulated. So, the claims themselves, and this is mentioned in the judge's opinion, the claims themselves also clearly apprise a person of ordinary skill in the art that these claims, these inventors, are directed to the as formulated material. So, no question there. But maybe that doesn't completely answer the other side's grammatical analysis of claim 1 itself. I mean, you're using the spec, you're using the prior art, you're looking at all these other claims, but you're never really honing in and doing an actual treatment on the actual words of the actual claim edition. Well, we actually do do an actual treatment in our brief, but I'll summarize it here. Well, the claims are laid out as covering a composition that has two components. And each of the components refers to their individual characteristics. It's a liquid cleaning concentrate and a container. The liquid cleaning concentrate says container containing that liquid concentrate, right? Exactly. It goes on to say, after they describe the characteristics of each of the components, the liquid cleaning concentrate must have a word content of less than 7.5 or 5, depending on which claim, and the container is comprised of a fill. Now, those things are constructed together to make the patent. Now, that's all that that claim discusses, and that's what it means for a person of ordinary skill. I mentioned earlier the Kennedy patent, that this patent was designed to distinguish itself from. Kennedy, Hack, Gladfeller, all of the prior art, have the same structure. So people in this field understood that when you were talking about a packet invention like this, when the claims describe the water container, liquid cleaning concentrate, and the container pre-construction, there's no prohibition to claims that have that structure. When the spec, the disclosure, and the claims themselves suggest that that is the way to look at the components, it doesn't convert it into a process claim. It's not a process claim. It doesn't convert it into something that is at odds with the invention. Now let's think for a minute about how Cotton Wash would ask this court to interpret the claims. They say measure the water content while it's in the bag, in contact with the coating. Well, no one does that. No one describes how to do that. What they're asking this court to endorse is a claim construction where sun could be liable for what happens six months, nine months, two years down the road, which depends on how someone, without such control, could utilize or store this invention. And nothing like that is disclosed in this statute. Is there any way to test the content of the bag without destroying the product? There's been absolutely no witness that testified that that could be done, and we don't know a way to do that. It requires disruption to test it. Okay. Thank you, Mr. Taylor. Thank you. I've only got two minutes left. I want to address the issue of the instability or the change, the range of the change. Apart from the Kong deposition testimony we talked about, the record's got extensive evidence. Kong testified that due to the chemical composition of the packaging film during the packaging, any change in the water content should be slight, and there should not be any significant change. That's at A375, 377. He also explained that once the film and liquid reach equilibrium after packaging, there should not be any significant change. That's at A376, 377. Sun's own expert testified that a person of ordinary skill would expect the measurement of water content prior to being placed in a water-soluble container to be the same as it is immediately after placed in the container, and that any changes to the liquid concentrate and container over time would be slight. That's A281. Sun's Vice President, Chuck Crawford, testified that he had seen no data suggesting that the water was migrating from the liquid detergent through the film into the atmosphere, and the products were designed to be stable. That's at A1675. One of the inventors confirmed that the changes in water content would be mostly insignificant. That's at A2830, 381. And Sun admitted in his briefing that while it is known that there may be some changes to the water content, these changes, if any, in Sun's products, are expected to be minor, and that was at A1338. So there is ample evidence in the record that any changes would be slight. There's not a degree of great precision as to what they may be, but they clearly would be slight. On the point of the prior art and what Kennedy said  water content, he said that liquid laundry detergent, it will absorb moisture through the water-soluble film. So Kennedy, contrary to what my friend has said from Sun, is actually saying that the water would be absorbed from inside the container. So it clearly teaches that the water would be inside the film, in the packet. Hack discusses water content of a final product. It does so, it's referenced in A697, the Hack patent at 458-59, and Gladfelder refers to water content of 10% weight water in the film, is the phrase that it uses, and it also uses 10% water weight in the bag, and that's at A621, the Gladfelder patent at 1832-51. So, again, the essential contrast between the 319 and the prior art is the amount of the water, the 7.5%, and specifically below the 10%, it's Aaron Kennedy. I think we're about out of time. Thank you. Well, thank you very much. Appreciate it. Thank both of you.